Phillip Kim, Esq.
Laurence M. Rosen, Esq.
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Timothy W. Brown, Esq.
THE BROWN LAW FIRM, P.C.
127A Cove Road
Oyster Bay Cove, NY 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

Patrick R. Leverty, Esq.
LEVERTY & ASSOCIATES LAW CHTD.
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| PATRICIA DES GROSEILLIERS, DERIVATIVELY AND ON BEHALF OF MEDBOX, INC., | CASE No.: |
| Plaintiff, | |
| vs. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: |
| PEJMAN VINCENT MEHDIZADEH, NED L. SIEGEL, GUY MARSALA, J. MITCHELL LOWE, BRUCE BEDRICK, JENNIFER S. LOVE, MATTHEW FEINSTEIN, C. DOUGLAS MITCHELL, AND THOMAS IWANSKI, | (1) BREACH OF FIDUCIARY DUTY;<br>(2) UNJUST ENRICHMENT |
| Defendants, | **JURY TRIAL DEMANDED** |

0

And

MEDBOX, INC.,

Nominal Defendant.

Plaintiff Patricia des Groseilliers ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Medbox, Inc. ("Medbox," or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Pejman Vincent Mehdizadeh, Ned L. Siegel, Guy Marsala, J. Mitchell Lowe, Bruce Bedrick, Jennifer S. Love, Matthew Feinstein, C. Douglas Mitchell, and Thomas Iwanski (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Medbox and unjust enrichment, and alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of Medbox's and the Individual Defendants' public documents, conference calls and announcements made by Medbox and the Individual Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Medbox and the Individual Defendants regarding Medbox, news reports, securities analysts' reports and advisories about the Company, press releases, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

/ / / /

Verified Shareholder Derivative Complaint

## NATURE OF THE ACTION

1.     This is a shareholder derivative action which seeks to remedy wrongdoing committed by Medbox's directors and officers.

2.     Medbox, through its subsidiary Medicine Dispensing Systems, sells  its patented vending machines that dispense medical marijuana, software and consulting services to pharmacies, alternative medicine dispensaries, and local governments in the United States.

3.     Medbox was founded in 2010 by Defendant Pejman Vincent Mehdizadeh ("Mehdizadeh"), a mid-30s aged immigrant with a checkered history of business failures and criminal conduct, including grand theft in 2013. At all relevant times,  Defendant Mehdizadeh has been Medbox's controlling shareholder, owning  approximately 65% of its common stock, and earlier on served  as  the Company's Chief Operating Officer and Chairman of its Board of Directors, and later, after resigning from those positions, acted as the Company's consultant, receiving greater compensation than the Company's Chief Executive Officer.

4.     Defendant Mehdizadeh, in complete disregard of his fiduciary responsibilities as a majority shareholder, officer, and director of a publicly traded company, abused Medbox and failed to manage Medbox pursuant to the requirements of a publicly traded Company.   In his own words, Mehdizadeh "was involved in almost every decision the company made."

5.     The misconduct engaged in by Defendant  Mehdizadeh includes acts  that bespeak of moral turpitude and a desire to deceive investors, such as: (1) hiring an

"independent" auditor that has been censured by the Public Accounting Oversight Board and is currently the subject, along with the Company, of a U.S. Department of Justice ("DOJ") grand jury; (2) attempting to conceal from investors that he is a convicted felon due to a con in which he and his father pretended to be attorneys and stole over $450,000 from people in need; (3) publicly denying the facts that the Company was under investigation by the SEC and was the subject of a federal grand jury investigation; (4) issuing false and misleading press releases without authorization under the Medbox name and logo at a time when he was neither an officer nor a director of the Company; and (5) causing the Company to issue false and misleading statements of material fact regarding its financial results.

6.      At all relevant times, Defendants caused the Company to issue materially false and misleading statements regarding the Company's financial results for the fiscal year ended December 31, 2013 ("FY 2013") and each of the interim financial periods ended September 30, 2013 ("3Q 2013"), December 31, 2013 ("4Q 2013"), March 30, 2014 ("1Q 2014"), June 30, 2014 ("2Q 2014") and September 30, 2014 ("3Q 2014").  Specifically, Defendants caused the Company to overstate the Company's revenues by recognizing revenue on customer contracts before it had been earned.

7.      On December 30, 2014, Defendants caused the Company to issue a press release disclosing that it would restate the past five quarters of financial reports and potentially its "financial statements for 2012 and for the first two quarters of 2013 ... as well."  The December 30 press release further disclosed that the earnings restatement had triggered a default by the Company on its debt covenants, forcing the Company to seek a

forbearance from lenders.  The Company press release stated that the "steps [being taken were] part of the continued initiative of [Medbox's] new board of directors and new management team to implement better controls and emphasize transparency."

8.      The Company's financial misstatements were so pervasive that they include: (a) the issuance of press releases in 2013 claiming the Company had "booked" $2 million in revenue in the first quarter of 2013 when it had not; and (b) the issuance of at least two sets of distinct financial statements reporting different results for the third quarter of 2013; (c) overstatement of over $1.3 million in revenues for fiscal year 2012; (d) overstatement of over $3 million in revenues for fiscal year 2013.

9.      Defendant Mehdizadeh has used his position as a majority shareholder to appoint and terminate directors at will and has completely dominated Medbox's Board and the corporation for his own benefit.

10.      Astonishingly, since 2013, Medbox's Board has been composed of 4 different sets of Directors.

11.      Additional evidence of Defendants' egregious fraud was disclosed by the Company on October 31, 2014.  The Company disclosed the following:  (a) a federal grand jury was investigating matters pertaining to Medbox and had issued a subpoena to the Company's public accountant; and (b) a whistleblower had contacted the SEC alleging that Defendant Mehdizadeh had engaged in insider trading and securities fraud.

12.      The majority of the Company's current board of directors knew about the grand jury investigation since August 2014, but concealed its existence from shareholders for three months.

Verified Shareholder Derivative Complaint

13.     Additionally, Defendant Mehdizadeh issued a series of press releases beginning on November 3, 2014 that denied that Medbox was being investigated by the SEC, forcing the Company to disclose to the public that Defendant Mehdizadeh's press releases were not accurate or authorized by Medbox.

14.     The Company's corporate governance was conspicuous by its absence. Until August 2014, Medbox failed to have an audit committee.  The Company adopted an Audit Committee Charter in August 2014, which required it to be comprised of three independent directors.  According to Medbox's SEC filings, only beginning in October 2014 did its Board have three independent directors.  Yet, the Company's audit committee still only has two independent directors.

15.     Defendants breached their fiduciary duties by causing the Company to issue false and misleading statements of material fact regarding the Company's revenue, by failing to disclose the grand jury investigation pertaining to Medbox matters and the SEC investigation of Medbox, by causing certain Defendants to receive excessive compensation, by failing to recover funds from Defendant Mehdizadeh that he was improperly paid or that he wastefully caused the Company to spend, by retaining an auditor that did shoddy audits and that was reprimanded by the Public Company Accounting Oversight Board ("PCAOB"), by failing to establish an audit committee, and, after the audit committee was recently established, by failing to appoint three independent directors to the audit committee.

16.     In light of Defendants' conduct, which caused the Company stock price to fall from over $40 per share before the fraud was exposed to close at $1.02 per share on April

Verified Shareholder Derivative Complaint

16, 2015, and which has subjected the Company and four of the Individual Defendants to being named as defendants in three federal securities fraud class action lawsuits, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

18.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.   Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of Nevada or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

////

////

////

Verified Shareholder Derivative Complaint

## PARTIES

21.    Plaintiff is a current shareholder of Medbox.  Plaintiff is and has been a shareholder of Medbox common stock continuously at all relevant times.  Plaintiff is a citizen of Pennsylvania.

22.    Nominal Defendant Medbox is a Nevada corporation headquartered in West Hollywood, California. It describes itself as a "leading dispensary infrastructure and licensing specialist, patented technology provider, and partner" to the cannabis industry. At all relevant times, Medbox's common stock was actively traded on OTCQB, under the ticker "MDBX."

23.    Defendant Bruce Bedrick ("Bedrick") was the Company's Chief Executive Officer and President until his resignation on July 23, 2014.  Defendant Bedrick served as a Company Director from December 2011 until he resigned from that position on August 18, 2014.  Defendant Bedrick has continued to serve the Company as a consultant since then.  Medbox's SEC filings referred to Defendant Bedrick as a "physician" and stated he possessed medical expertise relevant to Medbox's business, whereas Defendant Bedrick is actually a chiropractor, and not a medical doctor. Upon information and belief, Defendant Bedrick is a citizen of Arizona.

24.    Defendant Guy Marsala ("Marsala") has been the Company's Chief Executive Officer and President, as well as a Company Director, since July 23, 2014.   Upon information and belief, Defendant Marsala is a citizen of California.

25.    Defendant Thomas Iwanski ("Iwanski") was the Company's Chief Financial Officer from February 2014 until his resignation on October 16, 2014.   Since then,

Verified Shareholder Derivative Complaint

Defendant Iwanski has served as a consultant to Medbox.  From April 2013 until February 2014, Defendant Iwanski served Medbox as an accounting consultant.  Upon information and belief, Defendant Iwanski is a citizen of California.

26.     Defendant Matthew Feinstein ("Feinstein") served as a consultant for Medbox beginning in June 2013.  He was appointed as the Company's Vice President in February 2014.  He served as a Company director from April 2014 until October 2014.   Defendant Feinstein was to be appointed a director again, effective January 29, 2015, by Defendant Mehdizadeh and entities he controlled by way of a January 9, 2015 written consent that was illegal and subsequently withdrawn.  Upon information and belief, Defendant Feinstein is a citizen of California.

27.     Defendant Vincent Mehdizadeh ("Mehdizadeh") was the Company's Chief Operating Officer a Company Director from May 2013 until his resignation on April 10, 2014.  On April 10, 2014, Defendant Mehdizadeh was appointed as Medbox's "Senior Strategist and Founder."  On October 13, 2014 Defendant Mehdizadeh resigned as Senior Strategist, but continued being paid by Medbox as a consultant.  Defendant Mehdizadeh founded a predecessor company to Medbox in 2008 and acquired partial control of Medbox in 2011 and complete control of Medbox in 2012 when he purchased all of the outstanding shares.  Recently, Defendant Mehdizadeh has owned approximately 65% of Company common stock.  Upon information and belief, Defendant Mehdizadeh is a citizen of California.

28.     Defendant Ned L. Siegel ("Siegel") has been a Director of the Company since April 9, 2014. On December 17, 2014, Defendant Siegel was appointed Chairman of the

Verified Shareholder Derivative Complaint

Board of the Company. Defendant Siegel is a member of the Audit Committee, the Compensation Committee, and the Governance and Nominating Committee. Upon information and belief, Defendant Siegel is a citizen of Florida.

29.   Defendant C. Douglas Mitchell ("Mitchell") has served as Medbox's Chief Financial Officer since October 21, 2014. Upon information and belief, Defendant Mitchell is a citizen of California.

30.   Defendant J. Mitchell Lowe ("Lowe") has been a Director of Medbox since March 2014. Defendant Lowe is a member of the Governance and Nominating Committee and the Chairperson of the Compensation Committee. Upon information and belief, Defendant Lowe is a citizen of California.

31.   Defendant Jennifer S. Love ("Love") has been a Director of Medbox since October 22, 2014. Defendant Love is the Chairperson of the Audit Committee. Upon information and belief, Defendant Love is a citizen of Missouri.

32.   Defendants Mehdizadeh, Bedrick, Iwanski, Mitchell, Feinstein, Siegel, Marsala, Lowe, and Love are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.   By reason of their positions as officers, directors and/or fiduciaries of Medbox, and because of their ability to control the business and corporate affairs of Medbox, the Individual Defendants owed Medbox and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Medbox in a fair, just, honest, and equitable manner.

Verified Shareholder Derivative Complaint

The Individual Defendants were and are required to act in furtherance of the best interests of Medbox and its shareholders so as to benefit all shareholders equally.

34.     Each director and officer of the Company owes to Medbox and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Medbox, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.     To discharge their duties, the officers and directors of Medbox were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

37.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Medbox, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants has been

ratified by the Individual Defendants who collectively comprised the Medbox's Board of Directors at all relevant times.

38.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 and traded on OTCQB, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.   Accordingly, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

39.    To discharge their duties, the officers and directors of Medbox were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Medbox were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

       (c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       (d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

       (e)     remain informed as to how Medbox conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

       (f)     ensure that Medbox was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

40.    Each of the Individual Defendants further owed to Medbox and the shareholders the duty of loyalty requiring that each favor Medbox's interest and that of its shareholders over their own or over the interest of anyone else while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

41.    At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

////

////

////

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct at all relevant times.  At all relevant times, the Individual Defendants caused the Company to conceal the true facts as alleged herein.

43.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

44.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently to conceal material facts, misrepresent its financial results, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Medbox was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted    with    knowledge    of    the    primary    wrongdoing,    substantially    assisted    the

accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing.

## DEFENDANTS' MISCONDUCT

46. On April 2, 2013, the Company issued a press release entitled "Medbox Completes Financial Audit... Company is cleared to file Form 10 to become fully reporting with the SEC." The press release falsely stated that Medbox earned over $2 million in revenues for the quarter ended March 31, 2013. The press release stated in relevant part:

> Medbox, Inc. (OTC Markets: MDBX) (www.medboxinc.com), announced it has cleared a financial audit of its prior 2 years of operations. Q Accountancy Corporation of Irvine, California headed up the audit as a public company accountancy and oversight board (PCAOB) certified firm that specializes in complex audits of this size and scope.
>
> ....
>
> Of the $2,397,000 in receivables owed, $345,000 was written off by Medbox as discounts that were voluntarily given to the clients in question for materials and labor expended by said clients, that the company would have had to expend anyway, in pursuit of finalizing the contracted building of the dispensing locations. Those items were deducted from revenue at the discretion of the Auditor as opposed to being booked as revenue and offset as expenses, leaving a total receivables balance of $2,052,000. Of that amount, $673,250 was labeled as deferred income and not counted as revenue for the period ending 12/31/12. Between the $345,000 in voluntary discounts given to clients and the $673,250 in deferred revenue, Medbox's 2012 revenue was reduced to $3,525,636. However, Medbox reports that all $673,000 in deferred revenue was paid in Q1 2013 and as a result added to that quarter's revenue figures making Q1 2013 revenue well in excess of $2 million - a company record. In addition, the clients whom Medbox gave discounts have reengaged the company for additional equipment and services exceeding $350,000 booked in Q1 2013 to be paid in Q2 2013.
>
> ....
>
> "We are absolutely thrilled that we have cleared this proverbial hurdle in our company's history," stated Dr. Bruce Bedrick, CEO of Medbox, Inc. "We anticipate filing our Form 10 by Friday and 60 days thereafter the filing shall be deemed effective. We want to thank all of our supporters that helped us in becoming a viable public company."

47.    On April 3, 2013, the Company issued a press release entitled "Medbox to Engage 2nd Auditing Firm," which disclosed that the firm, Q Accountancy Corporation ("Q Accountancy"), that audited their financials for the quarter ended March 31, 2013 was inadequate.  The press release stated:

> Medbox, Inc. (OTC Markets: MDBX) (www.medboxinc.com) announced that it will engage a new public company accounting and oversight board (PCAOB) auditing firm to review the previously audited financials. The new firm's engagement is underway for purposes of providing audited financials for the filing of the Form 10 and on an ongoing basis thereafter.
>
> While Q Accountancy Corporation's audit delivered an acceptable set of financial statements, management believes a firm more focused and supportive of emerging microcap public companies would be best suited for long term operations. Management believes it is in the best interest of the shareholders and the company, as a whole, to make this change, although it will delay the filing of its Form 10 to the latter part of April.
>
> "The point is getting the job done with the right people. We have identified a firm and we look forward to announcing their engagement shortly," stated Dr. Bruce Bedrick, CEO of Medbox, Inc.  "Corporate governance is paramount and the company will do what is needed for the Form 10 to be viewed as favorably as possible by the SEC."

48.    The Individual Defendants should have known that Q Accountancy did shoddy audits and was reprimanded by the PCAOB, and that Q Accountancy's Chief Executive Officer and founder, Timothy Quintanilla ("Quintanilla"), was sued by the SEC and has been, and still is, a defendant in a securities fraud class action lawsuit.  Thus, the Individual Defendants breached their fiduciary duty by causing Medbox to retain Q Accountancy.

49.    Indeed, on November 8, 2012 the SEC filed a complaint against, among others, Quintanilla, in the United States District Court for the Southern District of New York for violations of the federal securities laws.

50.    On January 4, 2013 a class action complaint was filed against Quintanilla, among others, also in the United States District Court for the Southern District of New York for violations of the federal securities laws.

51.    Back on September 27, 2012, the PCAOB issued a report on Q Accountancy stating that there were audit deficiencies in Q Accountancy's work, that Q Accountancy failed to perform certain necessary audit procedures, and that Q Accountancy's system of quality controls is insufficient to assure that it will "conduct all testing appropriate to a particular audit."

52.    The PCAOB report stated in pertinent part:

The inspection team identified what it considered to be audit deficiencies.  Those deficiencies included a failure by the Firm to identify or appropriately address an error in the issuer's application of GAAP that appeared likely to be material to the issuer's financial statements.   In addition, the deficiencies included failures by the Firm to perform, or to perform sufficiently, certain necessary audit procedures.
....
The deficiencies identified in both audits reviewed included deficiencies of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient competent evidential; matter to support its opinion on the issuer's financial statements.
....
On the basis of the information reported by the inspection team, including the audit performance deficiencies [described  previously  in  the  report], the Board has concerns that the Firm's system of quality controls fails to provide such reasonable assurance in at least the following respects.... The Firm's system of quality control appears not to provide sufficient assurance that the Firm will conduct all testing appropriate to a particular audit.

53.    The Individual Defendants breached their fiduciary duty by causing Medbox not to replace Q Accountancy until February 2015 despite that the Company's April 3, 2013's press release stated that it would shortly thereafter do so.

54.     On April 10, 2013, Medbox filed on Form 10 with the SEC its financial statements for fiscal years ending December 31, 2012 and December 31, 2011.   The Form 10 included the following false statements that hid Defendant Mehdizadeh's criminal history:

> Mr. Mehdizadeh was the Director of Client Relations for the following law offices at various times from 2003 through 2008:  Law Office of Donald J. Townley; Law Offices of Frank E. Miller; Law Offices of Thomas R. Lee, Rexford Law Group; and the Moheban Law Firm.

> In 2007, Mr. Mehdizadeh was involved in the sale of his automobile to a private party. The transaction terms were in dispute by the parties and Mr. Mehdizadeh pled no-contest to using an access card (credit card) without the owner's consent. The matter was resolved with Mr. Mehdizadeh receiving probation. Mehdizadeh is still currently on probation for that offense.

55.     The truth about Defendant Mehdizadeh's criminal history was disclosed in a press release issued by the Los Angeles County District Attorney's Office on June 21, 2013, which was entitled "Father, Son Plead to Criminal Charges in $450,000 Unauthorized Practice of Law Case."  The press release stated in pertinent part:

> A father and son accused of stealing $450,000 from more than a dozen victims by offering unlicensed legal services pleaded no contest today, the Los Angeles County District Attorney's Office announced.

> Pejman Mehdizadeh, 35, of Los Angeles, told victims he was a licensed attorney or that he worked with one and that he could provide a variety of services – including obtaining green cards, loan modifications and divorces. His father, Parvis Mehdizadeh, 78, of Calabasas, assisted. Between 2002 and 2009, they took payments from 15 victims ranging from $2,000 to $200,000.
> ....
> The younger Mehdizadeh pleaded no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000. Los Angeles County Superior Court Judge Robert J. Perry immediately sentenced him to four years in state prison, suspended, and five years of formal probation.

Under the terms of a negotiated plea agreement, the son was ordered to pay back $450,000 in restitution on or by Oct. 21 or face prison time. To date, he has paid $370,000 in restitution.

The elder Mehdizadeh pleaded no contest to a misdemeanor violation of failure to obtain a bond required of those providing immigration assistance and was sentenced to three days in the county jail and two years of summary probation.

The case was investigated by the Los Angeles County District Attorney's Bureau of Investigation and the Los Angeles County Department of Consumer Affairs.

56.     On February 14, 2014, the SEC sent a letter to Medbox stating that, among other things, the Company failed to properly disclose Defendant Mehdizadeh's criminal history.  The SEC letter stated in pertinent part: "We also refer you to the Los Angeles County District Attorney's Office June 21, 2013 press release. Please ensure that your disclosure here encompasses all aspects of Mr. Mehdizadeh's plea, including the payment of fees in restitution."

57.     On April 11, 2014, the SEC sent a letter to Medbox stating once again that, among other things, the Company failed to properly disclose Defendant Mehdizadeh's criminal history.  The SEC letter stated in pertinent part:

Please revise your disclosure to significantly reduce or remove disclosure relating to Mr. Lee since he was not a party to the case. Further revise your disclosure to state that Mr. Mehdizadeh pleaded "no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000" and that he was ordered to pay back $450,000 in restitution. We refer you to the Los Angeles County District Attorney's Office June 21, 2013 press release. Please tell us whether Mr. Mehdizadeh has already paid the $450,000 and if not, please revise the disclosure accordingly. Also, please remove the last sentence beginning with "Mr. Mehdizadeh maintains his innocence . . ."

58.     On April 15, 2013, the Company issued a press release entitled "Medbox Positions Itself as the Leader on Wall Street in the Legalized Marijuana Industry."  The

press release once again made the false statement that in the quarter ended March 31, 2013 Medbox earned more than $2 million in revenues.

59.    On May 21, 2013, Medbox filed its quarterly report for the period ended March 31, 2013 with OTCmarkets.com (the "OTC 2013 1Q Quarterly Report").   The OTC 2013 1Q Quarterly Report stated that the Company earned revenues in the amount of $1,750,000 during the first quarter of 2013. Thus, the OTC 2013 1Q Quarterly Report revealed the falsity of the statements made in the Company press releases issued on April 2, 2013 and April 15, 2013 that the Company earned more than $2 million in revenues during the first quarter of 2013.

60.    On June 4, 2013, Medbox filed a letter with the SEC requesting withdrawal of the Form 10 it filed with the SEC on April 10, 2013 because the Company would "not have time to complete certain financial statement updates and address the [SEC] Staff's comments on the Registration Statement as set forth in its letter to the Company dated May 7, 2013."

61.    On September 30, 2013, the Southern Investigative Reporting Foundation ("SIRF") published an article about Defendant Mehdizadeh's past crimes, unethical conduct, and dishonesty and about Medbox's deceptive history, entitled "Tinkerer, Lawyer, Hustler, Lies: One Man's Path to a Dope Fortune."  The article states in pertinent part:

> In the spring of 2010, exasperated police detectives from all over Los Angeles began phoning the county's consumer affairs department to complain that an outfit calling itself the Active Lawyers Referral Service had misled its working-class customers from 2005 to 2008 by referring them to a law firm that billed them for work—but never finished the job. Their tales got positively woolly: Several claimed that Pejman Vincent Mehdizadeh, the founder of the referral service and the manager of the law firm, had posed as a lawyer and his father, Parviz, had given them legal advice as

Verified Shareholder Derivative Complaint

they sought work visas. (Pejman and Parviz use the names Vincent and Paul, respectively, for business.)

Three years later the consumer affairs unit, along with the Los Angeles County district attorney's office, sought to prosecute Vincent Mehdizadeh, who, after months of wrangling, pleaded no contest to various criminal charges. He consented to pay $450,000 in restitution to his victims, thereby avoiding a four-year sentence in a California state penitentiary. (His father, Parviz, pleaded no contest to one misdemeanor charge.)

....

Worth more than $200 million, Mehdizadeh is the first multimillionaire (legally) connected to the pot trade, no mean feat in an industry where prior to the start of legalization those at its pinnacle were often rewarded with long jail terms or the occasional bullet to the head.

....

Running his own [marijuana] dispensary business had proved to be a profound headache for Mehdizadeh: In 2007 the Drug Enforcement Agency raided Herbal Nutrition Center, his dispensary; and a lawsuit resulted from another dispensary transaction in which he was accused of posing as a lawyer and a real estate agent at different times. (Mehdizadeh told the Southern Investigative Reporting Foundation that he paid $350,000 to the plaintiffs to settle the matter and "make it go away.")

....

A search of Los Angeles area criminal records databases shows that from 1997 to 2007, Mehdizadeh was arrested or pleaded no contest for breaking and entering, solicitation, trespassing and credit card fraud. He declared bankruptcy in July 2010, after landing up to his neck in back taxes owed to the Internal Revenue Service. Earlier this year, he wound up in the middle of the aforementioned consumer affairs investigation.

....

Consider Mehdizadeh's tax problems. In his 2010 bankruptcy filing, he listed just under $2 million in back taxes owed the IRS for the 2003 to 2007 tax years. He attributed this situation mainly to a careless accountant who didn't properly handle a series of allowable deductions.  His lawyer negotiated the owed amount down to $1.2 million, Mehdizadeh said, claiming that his role in the mess was simply not having filed his federal income tax return in 2004 and 2005.

....

Mehdizadeh similarly claimed a 2006 arrest for solicitation of a prostitute and criminal trespassing with intent to injure was nothing more than a coverup of police brutality writ large. His account of the matter has him merely driving around in his new Porsche and being randomly stopped by the Los Angeles police. After asking the officer the reason for the stop, "I was taken out of my car and beaten," he said. Moreover, his car was impounded and he was arrested.

Verified Shareholder Derivative Complaint

Despite his allegations of police brutality, Mehdizadeh did not press charges, sue or even file a complaint. Rather, he pleaded no contest to both charges, was given two years probation and paid thousands of dollars to retrieve his impounded car. (A spokeswoman for the Los Angeles Police Department said she could not discuss details about the arrest with the Southern Investigative Reporting Foundation, citing California privacy statutes.)

....

One area where there is little room for debate is Mehdizadeh's penchant for posing as a lawyer. After the raid on his marijuana dispensary he wrote in a signed December 2007 post on Weedtracker.com, a dormant pro-marijuana legalization website, "I have a law degree and made managing partner in my firm before the age of 26."

Moreover, in a testimonial for a Web marketing company, Mehdizadeh signed his name "Vincent Mehdizadeh, J.D." Short for juris doctor, J.D. signals an accredited law school awarded a degree.

After Mehdizadeh initially strongly denied that he had posed as a lawyer, the Southern Investigative Reporting Foundation presented these two online claims to him and he acknowledged the fabrication: "I felt really insecure for many years not having gone to college, and it just came easily, occasionally telling people I was a lawyer," he said. "That was a dark place and time for me. I don't do anything like that anymore."

Mehdizadeh's many legal problems have never been disclosed to Medbox investors—except for a 2007 incident when he failed to produce a clear title to a car he was selling yet accepted a credit card payment for the vehicle anyway. The consumer affairs investigation, which had been headed for trial with the possibility of prison time for Mehdizadeh before he pleaded no contest, was blithely waved away in a Medbox filing as "a private matter."

....

For its audits and filing preparation, Medbox turned to Irvine, Calif.-based Q Accountancy. But Q Accountancy had a problematic history of its own with regulators and a legacy of troubled clients. In 2012, a congressionally appointed industry watchdog group—the Public Company Accounting Oversight Board—uncovered a sweeping array of deficiencies in Q Accountancy's auditing practices. And last November the SEC sued Q's founder, Timothy Quintanilla, for issuing misleading audits based on "reckless and deficient work."

....

How does a company that's trying to smarten its profile before selling more stock get into these jams? One way is to have no one in charge of financial oversight on a full-time basis. Until Sept. 1, the company's finance chief, Leila Guieb, was moonlighting part-time at Medbox while she worked as an employee at Toyota Financial Services. (Thomas Iwanski, a full-time finance executive, has since assumed her duties.)

Verified Shareholder Derivative Complaint

Another interesting hire in Medbox's crucial first years of existence was that of William Smith III, a man the company's fawning December press release framed as the Warren Buffett of the pet insurance industry. He was charged with launching a mergers and acquisitions department in a company with six full-time employees. Smith's numerous academic degrees on the press statement suggested that he had more accounting experience than the legendary Abraham Briloff.

But what was not disclosed is telling: He was chairman of a pet insurance venture called Ensurapet Inc. when the SEC tossed it from the markets because it failed to file annual and quarterly reports. Moreover, what business the company did do appears to have been centered around the ancient practice of selling unregistered securities in the form of promissory notes to retail investors, as a 2009 claim from the Arkansas Securities Commission argued.

That's not the only blot on Smith. During his tenure at the company,  the general counsel was Joseph Emas, someone the SEC had barred for two years from advising publicly traded clients in 2010 for drafting misleading filings for another client.

Smith was terminated from Medbox within months of his hire, according to a disclosure in the prospectus and has filed an arbitration claim against Medbox. And that's about par for the course for Medbox's  M&A effort, as two of the three companies it had sought to merge with are now litigating against the company, according to a footnote in the S-1.
....
Then there is the share transfer incident. When Mehdizadeh and the Los Angeles district attorney's office negotiated a plea in the legal advisory firm case, Mehdizadeh transferred Vincent Chase Inc., a holding company possessing more than 7 million shares of company stock, to Bedrick, Medbox's chief executive. (Mehdizadeh had named the holding company after the lead character in the HBO series Entourage— an interesting choice, given the character's drug habit and prodigious love life.)

In effect for only two months and disclosed only briefly in the S-1, the move appeared to have little precedent. Mehdizadeh denied there was a problem, saying the sale was performed "for the good of the shareholders."

How shareholders were protected is not clear, though, and the Southern Investigative Reporting Foundation could find no instance of a corporate executive temporarily deeding his holdings to a colleague.

Mehdizadeh is firmly convinced that had he gone to prison, Bedrick's control of Vincent Chase Inc. would have protected shareholders from harm. He is astounded that anyone would question the wisdom of the move: "Are you seriously asking me what impact a control person of a public company going to trial on 15 felony counts

Verified Shareholder Derivative Complaint

would have on investor confidence?" he said in reply to repeated requests from the Southern Investigative Reporting Foundation to clarify the reasons behind the move.

What the move did accomplish, however, was to keep the shares—potentially worth potentially hundreds of millions of dollars when they are registered—out of any settlement negotiations.

And questionable share transfers aren't the only things standing out in the Medbox filings.

On March 8, a Medbox press release announced a $6 million equity cash infusion, with $1 million already paid and $5 million to arrive in May. Yet, there's no sign of any of this in the company's SEC filings.

In April, Medbox filed a Form 10 as part of its effort to register its shares; the only reference to stock sales was this line in a footnote at the very end: "During January 2013, the Company received a total of $71,520 as payment for the sale of 16,000 shares of common stock during that period."

The S-1 filed in July offered no clues about the whereabouts of the promised millions.

Share sales did take place, but not along the lines promised by the press release. A note toward the back of the document stated, "From January 1 through July 11, 2013, the Company sold a total of 331,450 shares of common stock to accredited investors for $5 per share, or an aggregate of $1,407,250."

62.     On November 13, 2013, Medbox filed with the SEC a Form S-1/A-1.  The Form S-1/A-1 stated that Defendant Mehdizadeh was the Company's Chief Operating Officer, Chairman of the Board, and acting principal financial officer.

63.     The Form S-1/A-1 disclosed that Defendant Mehdizadeh's salary was $180,000, and his total compensation for 2012 was $410,706.  Yet Medbox's net income for the year ended December 31, 2012 was only $327,853.  The next highest paid Medbox officer was Defendant Bedrick, the Chief Executive Officer, who received $65,000 during the year ended December 31, 2012, which was 15.8% of  the amount  paid to Defendant Mehdizadeh.

64.     The Form S-1/A-1 provided slightly more information about Mehdizadeh's past criminal conduct, but still was deceptive.  The Form S-1/A-1 stated in pertinent part:

> Prior to December 2012, Mr. Mehdizadeh was the CEO and Founder of MDS.  Prior to founding MDS, Mr. Mehdizadeh was the Director of Client Relations for the following law offices at various times from 2003 through 2008:  Law Office of Donald J. Townley; Law Offices of Frank E. Miller; Law Offices of Thomas R. Lee; Rexford Law Group; and the Moheban Law Firm.
>
> Our Board of Directors believes that Mr. Mehdizadeh's qualifications to serve as a Director of Medbox include his experience and knowledge of our main product as the founder of MDS and the creator of the Medbox as well as his knowledge of the alternative medicine market as a result of such experience.
>
> In 2007, Mr. Mehdizadeh was involved in the sale of his automobile to a private party.  The transaction terms were in dispute by the parties and Mr. Mehdizadeh pled no-contest to charging the vehicle purchaser's credit card without express written consent.  The matter was resolved with Mr. Mehdizadeh receiving and successfully completing probation. Mr. Mehdizadeh has applied for an expungement of the record and is awaiting the outcome of that request, which should result in a deletion of the record.
>
> During 2005-2008, Mr. Mehdizadeh was the non-attorney manager for a law firm. In 2008 the supervising attorney whom clients had retained to handle their legal matters retired and left clients without representation.  The department of consumer affairs of Los Angeles investigated the matter and decided to recommend prosecution against Mr. Mehdizadeh and not Mr. Mehdizadeh's attorney employer. After a 15 count criminal complaint was filed in 2010, in order to avoid a trial and ongoing bad publicity, Mr. Mehdizadeh pled no-contest to two counts related to theft since money was accepted by the attorney and work had not been completed due to the attorney retiring. Mr. Mehdizadeh accepted the terms of the plea that called for probation and that once Mehdizadeh's probation is complete, it was pre-negotiated that the record of the incident be deleted.  Mr. Mehdizadeh maintains his innocence and believes he was unfairly targeted.

65.     On November 19, 2013, Defendants Mehdizadeh and Bedrick published Medbox's quarterly report for the quarter ended September 30, 2013 on OTCmarkets.com, but did not file it with the SEC.

66.     The quarterly report disclosed the following financial results: (1) as of September 30, 2013, the Company had total current assets of $3,276,992, and, as of December 31, 2012, total current assets of $3,456,802; (2) as of September 30, 2013, the Company had total assets of $6,464,170, and, as of December 31, 2012, the Company had total assets of $3,512,670; (3) the Company earned revenues in the amount of $2,079,454 for the three months ended September 30, 2013; (4) the Company earned revenues in the amount of $5,046,634 for the nine months ended September 30, 2013; (5) the Company's net income was in the amount of $258,945 for the three months ended September 30, 2013; and (6) the Company's net income was in the amount of $388,284 for the nine months ended September 30, 2013.

67.     The quarterly report stated that Medbox's financial results for the year ended December 31, 2012 were "restated."  The quarterly report did not provide an explanation for the restatement.

68.     On November 20, 2013, Medbox announced its financial results for the quarter ended September 30, 2013, boasting of "record revenues" in its press release. Medbox reported that it earned $5.05 million in revenues during the nine months ended September 30, 2013, and that it earned $2.08 million in revenues during the three months ended September 30, 2013.  The financial results were posted on the Company's website and on the Company's landing page on the OTC Markets website.

69.     The press release also stated "'We have had another record breaking quarter, which provides further validation that our business plan is solid and our operating strategy is sound,' stated Dr. Bruce Bedrick, CEO of Medbox, Inc.  'As we move forward, we will

continue to seek out opportunities that provide growth for our company and added value for our shareholders.'"

70.     On January 21, 2014, Medbox filed a Form 10 with the SEC.  The Form 10 stated that Defendant Mehdizadeh beneficially owned or controlled 63.6% of Medbox's outstanding common stock, and Defendant Bedrick beneficially owned 24.7% of Medbox's outstanding common stock.

71.     The Form 10 stated that total compensation paid during 2012 by the Company to Defendant Mehdizadeh was $262,500 and to Defendant Bedrick was $34,729.

72.     The Form 10 did not account for its contradicting the Form S-1/A-1 filed on November 13, 2013, which stated that total compensation paid during 2012 by the Company to Defendant Mehdizadeh was $410,706 and to Defendant Bedrick was $65,000.

73.     The Form 10 also provided Medbox's financial results.  These financial results restated financial results that Medbox previously reported on filings with OTCmarkets.com.

74.     Yet, Medbox's Form 10 did not acknowledge that it had thus made such a restatement, let alone provide an explanation for the restatement.

75.     The Form 10 reported as follows: (1) as  of  September 30, 2013, the Company had total current assets of $3,338,218 (previously reported $3,276,992 with OTCmarkets.com); (2) as of December 31, 2012, the Company had total current assets of $3,495,156 (previously reported $3,456,802 with OTCmarkets.com); (3) as  of  September 30, 2013, the  Company had total assets of $7,422,866  (previously  reported  $6,464,170 with OTCmarkets.com); (4) as of December 31, 2012, the Company had total assets of $7,422,866  $3,551,024   (previously  reported   $3,512,670 with OTCmarkets.com); (5)

the Company earned revenues for the three months ended September 30, 2013 in the amount

of $1,980,720 (previously reported $2,079,454 with OTCmarkets.com); (6) the Company

earned revenues for the nine months ended September 30, 2013 in the amount of

$4,801,062 (previously reported $5,046,634 with OTCmarkets.com); (7) the Company had

a net loss for the three months ended September 30, 2013 in the amount of $178,925

(previously reported net income of $258,945 with OTCmarkets.com); and (d) the Company

had a net loss for the nine months ended September 30, 2013 in the amount of $43,825

(previously reported net income of $388,284 with OTCmarkets.com).

76.     The letter that the SEC sent to Medbox on February 14, 2014 delineated

various defects in the Form 10 that the Company filed with the SEC on January 21, 2014.

Some of the defects that the SEC stated had to be corrected are as follows:

- o incorrect pagination;
- o misleading descriptions of Medbox's business and "geographic reach;"
- o failure to define key terms;
- o failure to include necessary attachments;
- o inconsistent description of territories where the Company served consulting clients (i.e., mentioning Oregon on one list and omitting Illinois, Nevada, and Oregon on another);
- o failure to provide a basis for the disclosed belief that Medbox was "positioned to be the leader in compliance and inventory control;"
- o failure to properly discuss revenue recognition;
- o in some places the Company stated it sold a certain number of machines during a certain quarter and in others the Company stated that it had sold the same number during the entire year;
- o inexplicably recording $190,400 in marketable securities as a liability;
- o disclosures stating there were no material changes in consolidated statement of cash flows during a certain period, but disclosing significant changes in net cash from investing and financing activities during the same period; and
- o failure to explain a substantial salary increase for then-Chief Executive Officer Bedrick, in addition to numerous other problems. The letter also states "please ensure that your disclosure [regarding Defendant

Mehdizadeh's criminal history] encompasses all aspects of Mr. Mehdizadeh's plea, including the payment of fees in restitution."

77.     On the morning of February 18, 2014, Medbox issued a press release on February 18, 2014 praising the Obama administration for the new rules that it said would ease the concerns of banks wanting to deal with businesses that legally sell marijuana. In this same press release, Medbox told investors that its Chief Executive Officer, Defendant Bedrick, would be appearing on CNBC'S Closing Bell on February 18, 2014 and on Fox Business the following day on February 19, 2014.

78.     On February 18, 2014, *Citron Research* ("*Citron*") issued a report entitled "Busting Medbox," which stated that Medbox kept three sets of books and that Defendants' "systemic fraud" and stock promotion had facilitated the Company's $1 billion market capitalization.   The report stated about Defendants' misconduct:  "This is a Full On Fraud... It is not as if Medbox is a company that has had a few reporting deficiencies amidst  a small but  growable  business  core. Rather, everything they do seems to have an underlying purpose of deception."

79.     Following the release of the *Citron* report, the Company issued a press release in the afternoon of February 18, 2014 entitled "Medbox Responds to Critics and Issues Status Update to Company Shareholders." The press release states in pertinent part:

> WEST HOLLYWOOD, Calif., Feb. 18, 2014 /PRNewswire/ -- Medbox, Inc. (OTC Markets: MDBX) (www.medboxinc.com), a leader in providing consulting services and patented systems to the medical and retail industries, issued a status update to its shareholders on past, present, and future projects. **Company executives also commented on bloggers looking to discredit the company for financial gain and law firms looking to capitalize on misinformation in order to solicit clients**.

Verified Shareholder Derivative Complaint

The following is a summary of key events occurring in recent weeks:

- Medbox filed its Form 10 with the SEC in January and **will be an SEC filer, with all the burdens and benefits that result from that status, as of mid-March 2014**.

....

Company executives clarified their position on the restatement of financials that accompanied the Form 10 registration statement filed with the SEC as a maturation process in becoming an SEC filer.

"The company undertook a project to bring all accounting functions in house and during that lengthy process we discovered some errors in accounting which we have since corrected in the latest financials included in the Form 10. **The point is getting it right and being fully transparent with our shareholders at all times,**" stated Vincent Mehdizadeh, Board Chairman at Medbox, Inc. **"The company has, as part of those corrections, instituted better controls over financial reporting to avoid further corrections.** In addition, it is important to note that revenues for the nine months of 2013 had increased over the comparative period of the prior year (as corrected) and we are continuing to add skilled people to accelerate our growth in 2014. Unfortunately, when you are the most visible company in the space, with a large market capitalization, you become a target."

**Company executives caution company shareholders that while the media has been extremely supportive of Medbox as one of the only viable medical marijuana related public companies, with success there will always be opponents that publish deceptive and misleading articles about the company and its executives.**

In addition, company executives clarified that the company offers support services to the medical marijuana sector on an arm's length basis. Often times in a state where applications are being accepted for marijuana dispensary licensing, some landlords would not lease to the newly formed non-profit entities formed for the company's clients. As a result, in some rare instances and simply as an absolute benefit to their clients, it was agreed that Medbox would lease the properties and assign all rights to the applicant, with the permission of the landlord.

"We go the extra mile for our clients and that is evident through our glowing testimonials displayed on our websites," stated Dr. Bruce Bedrick, CEO at Medbox, Inc. "Interestingly, with the recent banking policy guidance by the federal government, we can now start to develop an additional revenue stream

of acquiring properties and leasing to our dispensary operator clients. This is one of many revenue streams that Medbox is actively developing given the current climate and relaxed federal posture."

(Emphasis added).

80.    On March 31, 2014, Medbox filed a Form 10 A-1 with the SEC, which included its audited financials for the year ended December 31, 2013.  Medbox reported revenues of $5.2 million for the year ended December 31, 2013, representing a 101.7% increase relative to the revenues it reported for the year ended December 31, 2012.

81.    The Form 10 A-1 also provided slightly more information about Defendant Mehdizadeh's past criminal conduct than was disclosed in the Form S-1/A-1 filed with the SEC on November 13, 2013; but, the Form 10 A-1 was still deceptive.    The Form 10 A-1 thus stated in pertinent part:

In 2007, Mr. Mehdizadeh was involved in the sale of his automobile to a private party.  The transaction terms were in dispute by the parties and Mr. Mehdizadeh pled no-contest to charging the vehicle purchaser's credit card without express written consent.  The matter was resolved with Mr. Mehdizadeh receiving and successfully completing probation. Mr. Mehdizadeh has applied for an expungement of the record and is awaiting the outcome of that request, which should result in a deletion of the record.

During 2005-2008, Mr. Mehdizadeh was the non-attorney manager for a law firm. In 2008 the supervising attorney, Thomas R. Lee [CA SBN 61858], whom clients had retained to handle their legal matters retired and left clients without representation. The department of consumer affairs of Los Angeles investigated the matter and decided to recommend prosecution against Mr. Mehdizadeh and not Mr. Mehdizadeh's attorney employer, Mr. Lee.  After a 15 count criminal complaint was filed in 2010, in order to avoid a trial and ongoing bad publicity, Mr. Mehdizadeh pled no-contest in 2013 to two counts related to theft that resulted in probation. Under the terms of a negotiated plea agreement, Mr. Mehdizadeh voluntarily paid $450,000 in restitution to clients of Mr. Lee's office.  Mr. Mehdizadeh accepted the terms of the plea that provided that once Mehdizadeh's probation is complete, the record of the incident be deleted.  Mr. Mehdizadeh maintains his innocence and believes he was unfairly targeted.

82.   On April 11, 2014, Medbox filed a Form 8-K with the SEC that stated that Defendants Feinstein and Siegel had been elected to the Medbox Board of Directors on April 9, 2014.

83.   The Form 8-K also disclosed that Defendant Mehdizadeh resigned as Chief Operating Officer and as Director, but was appointed "Senior Strategist and Founder of the Company" on April 10, 2014.

84.   On April 11, 2014, SEC sent a letter to Medbox that not only stated that the Form 10 A-1 filed by the Company with the SEC on March 31, 2014 needed to correct and provide more complete disclosure about Defendant Mehdizadeh's criminal history, but also delineated numerous defects in the Form 10 A-1 that Medbox had to correct.

85.   On June 27, 2014, Medbox filed a Form 10-Q/A with the SEC ("Q1 2014 10-Q/A"), which included financial results for the quarter ended March 31, 2014.  The Q1 2014 10-Q/A announced revenue of $294,550 for the first quarter of 2014.  The Q1 2014 10-Q/A and the accompanying Sarbanes-Oxley Certifications were signed by Defendants Bedrick and Iwanski.

86.   On July 1, 2014, the Company issued a press release entitled "Medbox Becomes a Fully Reporting Public Company - Company's Form 10 deemed effective by SEC."  The press release stated that "the Company's Form 10 filing has been deemed effective by the Securities and Exchange Commission, with no outstanding comments left to address."

87.   On July 24, 2014, Medbox issued a press release entitled "Medbox Appoints Mr. Guy Marsala as CEO."  The press release stated that Defendant Bedrick was resigning

as the Company's Chief Executive Officer and President.  The press release stated that Defendant Marsala would replace Defendant Bedrick in each of those positions, but also would be the Company's Chairman.

88.    On August 14, 2014, Medbox filed a Form 10-Q with the SEC, which included financials for the quarter ended June 30, 2014 ("Q2 2014 10-Q").  The Q2 2014 10-Q announced revenue of $434,448 for the second quarter of 2014.  The Q2 2014 10-Q and the accompanying Sarbanes-Oxley Certifications were signed by Defendants Marsala and Iwanski.

89.    On August 22, 2014, Medbox filed a Form 8-K with the SEC that stated that Defendant Bedrick resigned as Company Director, but that he would continue with the Company as a consultant.

90.    During August 2014, according to a complaint later filed by Medbox in an unrelated proceeding, Defendant Mehdizadeh and Medbox learned that the DOJ had served grand jury subpoenas on Q Accountancy and a certified public accountant named Alex Anguiano.  According to Medbox's complaint, the subpoenas sought "all  documents related to  financial  transactions involving Medbox."   The Individual Defendants breached their fiduciary duty by failing to disclose the service of these subpoenas and the existence of the grand jury investigation to the investing public.

91.    On October 17, 2014, Medbox filed a Form 8-K with the SEC that stated Defendant Mehdizadeh resigned as an officer of Medbox on October 13, 2014.  The Form 8-K stated that Defendant Mehdizadeh would continue with the Company as a consultant, and whose title would be "Founder and Senior Advisor."

92.     On October 21, 2014, Medbox filed a Form 8-K with the SEC that stated that Defendant Iwanski resigned as the Chief Financial Officer.  The Form 8-K stated that Defendant Mitchell would replace him as the Chief Financial Officer.

93.     On October 28, 2014, Medbox filed a Form 8-K with the SEC that for the first time referred to the Company's having an audit committee.  The Form 8-K stated that Defendant Love, who became a Company Director on October 24, 2014, would serve as the Chair person of the Company's Audit Committee.

94.     On October 31, 2014, Medbox filed a Form 8-K with the SEC that disclosed that on October 27, 2014 the Company's board of directors appointed a special committee to investigate the documents sought by the grand jury and the subpoenas served on the Company's accountants and the allegations in a letter sent to the SEC by a former Medbox employee, including that Defendant Mehdizadeh engaged in insider trading and securities fraud.

95.     The Form 8-K stated that the special committee was comprised of all of Medbox's directors at the time the Form 8-K was filed:  Defendants Lowe, Siegel, Love, and Marsala.

96.     On October 31, 2014, Medbox filed another Form 8-K with the SEC that stated that Defendant Feinstein resigned as a Company director on October 30, 2014, but that he would continue serving Medbox as Vice President.

97.     On November 3, 2014, Defendant Mehdizadeh issued a press release entitled "Medbox Comments on  Recent  8-K Filing."  Although the title of the press release made

Verified Shareholder Derivative Complaint

it appear that the Company issued it, it was not posted on the Company's website along with other Company press releases.

98.     Defendant Mehdizadeh's press release stated that none of the Defendants or Medbox had received subpoenas, that that Company found that the letter sent to the SEC by the Company's former employee was not truthful, and that the former employee sent the letter in retaliation for the Company's not agreeing to the settlement terms he demanded related to the employment claims he made in a lawsuit that was dismissed.

99.     Defendant Mehdizadeh's press release stated in pertinent part:

LOS ANGELES, Nov. 3, 2014 /PRNewswire/ -- Medbox, Inc., (OTCQB: MDBX), the leading licensing, infrastructure and security specialist, patented technology provider, and partner to the cannabis industry, commented on the recent 8-K filing discussing matters pertaining to a former employee of the company who filed an employment claim and sent a letter to certain government agencies asserting claims against the Company. The former employee subsequently lost the employment claim. However, the Company is now internally investigating the letter's contents to ascertain validity of the claims.

The 8-K references that the Board of Directors of Medbox, Inc. appointed a special board committee to investigate, review, and evaluate a letter involving the Company, sent in May 2014 to certain government agencies by a former employee of Medbox. Within the last few weeks, Medbox was awarded a judgment against this employee on his employment claims, which demanded $1.5 million in damages related to the Company's alleged wrongdoing. Prior to litigation of the employment claim, and after repeated settlement demands were made by the former employee and rebuffed by Medbox, the employment claim was filed and sent along with a letter to government agencies by the former employee, alleging wrongdoing by the company.

Mr. Vincent Mehdizadeh, Founder and Consultant to Medbox stated, "The former employee vowed to retaliate against the Company in any way he could after his illegal cash demands of the company were ignored. It now appears that writing a letter to government agencies filled with factual inaccuracies and blatant falsehoods was the most effective way to facilitate that goal."

Current management commented that the Company has not found any indications that the subject matter contained in the letter is true concerning the conduct of prior officers of the company.  However, the company's internal investigation on the

matter is still in process. The Company also clarified that no subpoenas have been served on the Company, it's [sic] current or former officers, or anyone affiliated to the Company.

Mr. Mehdizadeh added, "I painstakingly put together the best management team and Board of Directors in our sector for a reason, and in their judgment this voluntary disclosure is what good public companies that have nothing to hide should do. The company will continue to demonstrate to shareholders, the investment community, and all other public company participants in the cannabis sector, how a well-run and respectable public company should operate. Medbox has and will continue to be the gold-standard for accountability."

100.   On November 4, 2014, the media noted that -- as to the identity of the former officer of Medbox who currently serves Medbox in a consultant, and who is the alleged wrongdoer in the letter sent by the former employee to the SEC -- according to the Company's Form 8-K about appointment of the special committee, it could be one of three Defendants.  Indeed, each of Defendants Mehdizadeh, Bedrick, and Iwanski resigned in 2014 as officers, but stayed on as Company consultants.

101.   On November 6, 2014, Defendant Mehdizadeh issued another press release entitled "Online Publication Retracts Headline Implying Medbox is Under Investigation," without causing it to appear as though it was issued by Medbox.  The press release stated in pertinent part:

LOS ANGELES, CA / ACCESSWIRE / November 6, 2014 / P. Vincent Mehdizadeh - Founder and Majority shareholder of Medbox, Inc. (OTCQB: MDBX) commented today that online publications, thestreet.com and thedeal.com retracted a headline that incorrectly asserted that Medbox is under investigation by the SEC.

"I am personally relieved that the headline and key pieces of the article were corrected," commented Mehdizadeh. "However, the damage to investor confidence yesterday was substantial and I am meeting with my legal team to discuss possible remedies available to make an example out of this online publication and to ensure incorrect information is never disclosed about the company again."

102.   On November 7, 2014, the Company filed a Form 8-K with the SEC that stated that "the news release issued Monday, November 3, 2014 under the headline 'Medbox Comments on Recent 8-K Filing' was not authorized by Medbox, Inc. ... for distribution. The 8-K filed by the Company on Friday, October 31, 2014, should be used as a reference for information regarding this matter."

103.   On November 12, 2014 the Company filed a quarterly report on Form 10-Q with the SEC that contained financial results for the quarter ended September 30, 2014 ("3Q 2014 10-Q").   The 3Q 2014 10-Q stated that the Company had earned revenues in the amount of $107,429 for the three months ended September 30, 2014.

104.   The 3Q 2014 10-Q also disclosed that the SEC is conducting an investigation pertaining to Medbox and that it had served a subpoena on Medbox.   The 3Q 2014 10-Q thus stated in pertinent part:

> On November 10, 2014, the Los Angeles Regional Office of the Securities and Exchange Commission (the "SEC") notified the Company that it is conducting an investigation pertaining to the Company and issued a subpoena to the Company for documents from December 1, 2011 to the present relating to the matters it is reviewing. The Company plans to cooperate fully with the SEC staff to complete the investigation on a timely basis.

105.   On December 2, 2014, Medbox's current board of directors conveyed to Defendant Mehdizadeh that they believed that Medbox had previously incorrectly recognized revenue under his leadership.   Defendant Mehdizadeh retaliated by threatening to remove the current directors from the Company's board.

106.   On December 4, 2014, Defendant Mehdizadeh threatened to remove the entire current board of directors via written consent and then conveyed to the Company's directors and officers they were "terminated as officers of any and all Medbox companies,

with cause, effective immediately."  Defendant Mehdizadeh thereafter agreed to withdraw his termination demand.

107.    On December 12, 2014, Defendant Mehdizadeh once again threatened to fire Medbox's directors and officers.

108.    On December 22, 2014, Medbox filed a Form 8-K with the SEC that stated that "[o]n December 16, 2014, the Board of Directors of Medbox, Inc. (the "Company") amended the Company's Amended and Restated Bylaws to prohibit action by written consent without a meeting of the stockholders of the Company."

109.    On December 30, 2014, the Company filed a Form 8-K with the SEC that disclosed that the Company's Audit Committee discovered evidence of the falsity of the statements about the Company's financial results that it had previously disclosed.  The Form 8-K stated in pertinent part.

> the consolidated financial statements for the year ended December 31, 2013 and for the third and fourth quarters therein, as well as for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014, together with all three, six and nine month financial information contained therein, should no longer be relied upon and will be restated to correct the errors. Therefore, all earnings press releases and similar prior communications issued by the Company as well as other prior statements made by or on behalf of the Company relating to financial reporting or results for those periods should not be relied upon. Lastly, as part of the investigation process, the Company will also examine its financial statements for 2012 and the first two quarters of 2013 and if necessary correct those as well.

110.    The Form 8-K also admitted that Medbox had been recognizing revenue "too soon on some customer contracts," which caused the need for restatements of the Company's financial results.

111.    The Form 8-K also stated that the Company was served subpoenas from the federal grand jury and the SEC after the special committee was appointed in October 2014.

112.   The Form 8-K also stated that Defendant Marsala resigned from the special committee in order for it to be comprised entirely of independent directors.

113.   Also on December 30, 2014, Medbox issued a press release entitled "Medbox, Inc. To Amend and Restate Prior Period Financial Statements."  The press release stated, *inter alia*, that "[t]he company intends to correct the errors in its financial statements to bring them into conformity with accounting principles generally accepted in the United States of America (GAAP) and SEC regulations. Medbox plans to engage an independent CPA firm to consult with and assist the Company's staff with preparing restated financial statements as soon as possible."

114.   Later that same day, Defendant Mehdizadeh issued a press release entitled "Medbox's Largest Shareholder Comments on Recent Events and the Company's Outlook for 2015."  The press release stated that Defendants Mehdizadeh and Iwanski as well as Q Accountancy conveyed to Medbox that they believed that the revenue the Company previously reported did not need to be restated.

115.   Defendant Mehdizadeh's press release stated in pertinent part:

LOS ANGELES, CA--(Marketwire - Dec 30, 2014) - P. Vincent Mehdizadeh -- Founder and Majority Shareholder of Medbox, Inc. (OTCQB: MDBX) issued a letter to fellow shareholders today regarding his vision for the future of the company and insight into recent developments affecting the company.

The letter stated:

"Dear Medbox Shareholders:

It has truly been an interesting journey during the last 2 years. When I commenced operations of the private company in 2010 that later became Medbox, I never anticipated that the company would be as noteworthy and relevant as we are today. The company has a rare blend of consulting and patented technology that gives entrepreneurs a jumpstart on realizing their dreams of operating a business in a newly

Verified Shareholder Derivative Complaint

emerging industry. I have thoroughly enjoyed watching our client's dreams be realized, along with our shareholders that have watched our company grow and prosper over these years.

Medbox rocketed to stardom and notoriety amidst a positive outlook for the marijuana industry in November of 2012 based on favorable election results and highlighted by several media sources, including the Wall Street Journal, which ushered in what many have called the 'Green Rush.' In the days that followed, the company's stock price saw unprecedented increases that was said to have resulted from investors looking to participate in 'The Next Great American Industry.' Up until 3 months ago, I was involved in almost every decision the company made, and my decision at that time was to caution investors about investing in any company in the marijuana industry because of the inherent risks. We also publicly cautioned investors to temper their expectations about our stock and to make informed investment decisions. The company fielded criticism in doing so, but we felt that separating ourselves from other public company industry participants in our sector and focusing on protecting investors as best we could was a beneficial direction for the company. In my opinion, one of the keys to Medbox's success has been superior corporate messaging and timely dissemination of information to our shareholders.

Since that point in time a little over two years ago, I have made it my mission to take the company from being a non-reporting pinksheet to being a fully reporting SEC Filer. I took it upon myself to set these goals and achieve them for the benefit of the company and its shareholders. We did this to have an increased level of transparency so that investors can think of Medbox as the public company standard for respectability and reliability in the newly emerging marijuana industry that was taking shape. As a result, we engaged a Public Company Accounting and Oversight Board (PCAOB) registered auditor, Q Accountancy Corporation, and also hired a full-time Chief Financial Officer, Thomas Iwanski, a CPA with excellent references and extensive public company experience.

Since the company engaged Mr. Iwanski and Q Accountancy Corporation, I also recruited a star-studded board and together we appointed Guy Marsala to lead the company as the Chief Executive Officer. As it was explained to me, in situations where a new CEO is brought on, they typically look to appoint their own Chief Financial Officer. Thus, when Mr. Marsala decided to replace Mr. Iwanski as CFO, I did not give it a second thought, although I was sad to see him go since his experience with public company oversight was superb.

Today, the company's current management issued a statement regarding the company's financials. Prior management, including Mr. Iwanski and the company's current auditor, both disagree with current management's position on the matter. Both the current auditor and prior CFO have made their opinions known to current management, to no avail. Both have stated that they had support for recognizing

revenue in the periods in which they were recognized. However, the company's current CFO has a difference of opinion on that aspect and believes that the revenue in question should be recognized in later periods, which has now resulted in a proposed restatement set to occur. This fact along with the fact that the revenue items in dispute amount to less than 10% of the total revenue booked for 2013, was not accurately discussed in the disclosure released this morning.

As stated previously in this letter, corporate messaging and communication to shareholders is one of the many aspects that made Medbox a great company. I now feel the company is not doing enough to accurately disclose matters in a manner that is easy to understand and digest by the public. Stating that the current CFO has a difference of opinion with the prior CFO and current auditor would have gone a long way to explaining the situation properly. Instead, we have the inaccurate and incomplete disclosure that was released today that leaves the public with more questions than giving them the answers they need to understand the situation.

As we were on a path to transition to NASDAQ and had filed an application to be listed on that exchange, I felt that since I had a checkered past that was disclosed in company filings it would tarnish the Medbox brand if I stayed involved in any capacity other than as a consultant to the company. Although these offenses were non-violent, non-securities related offenses, all of which resulted in probation and all occurring prior to Medbox, I still felt that the company would always be a target of 'short and distort' campaigns by financial bloggers if I remained an Officer or Director. To that end, I recently gave full control to the board and current management to steer the ship and navigate the company properly. Recent events have caused me to call into question whether current management and the board of directors has enough industry experience to properly run this company. It is for this reason that I will be adding industry-experienced members to the board to work with the current board members to more effectively operate the company. I will also be taking a more active role with the company again to ensure our short-term and long-term goals can be achieved.

I believe that a founder's passion separates a typical company from a company that achieves the utmost success. The company needs my help now more than ever, and I intend to fill that need to the best of my ability going forward. I look forward to a strong and prosperous future for Medbox.

Regards,
P. Vincent Mehdizadeh"

116.   On December 31, 2014, Medbox filed a Form 8-K with the SEC stating that Defendant Siegel was appointed the Company's Chairman.  Defendant Marsala remained a director of the Company.

117.   On January 9, 2015, Defendant Mehdizadeh filed a Schedule 14C with the SEC stating that, in lieu of a special meeting of stockholders, the majority of Medbox's stockholders executed a written consent that day to replace all of Medbox's current directors with Defendants Feinstein and Mehdizadeh and with Jaime Ortega and David Trecek.

118.   On January 16, 2015, the Company filed a complaint in the Superior Court of California for the County of Los Angeles that claimed the January 9, 2015 written consent was not legally effective.  The complaint stated that the current board of directors had discovered "significant" evidence related to Defendant Mehdizadeh's conduct while employed in various capacities at Medbox.  The complaint stated that Defendant Mehdizadeh engaged in the following misconduct while serving at Medbox:

- engaged in manipulation of Medbox's revenue recognition and other financial disclosures;
- made public statements related to Medbox that contained false and/or misleading information;
- potentially violated numerous securities laws;
- engaged in what appear to be improper transactions involving third-party affiliates;
- made material misrepresentations to Medbox's investors and/or potential investors; and
- ignored and/or attempted to hide significant accounting and other financial control and oversight issues existing at Medbox.

119.   On January 26, 2015, the Company filed a Form 8-K with the SEC that disclosed that on January 21, 2015, the Company and Defendant Mehdizadeh entered an agreement that he and the entities he controlled would withdraw the written consent to

41

replace the Company's board of directors; that the Company would dismiss with prejudice the complaint it filed in the Superior Court of California for the County of Los Angeles; that Defendant Mehdizadeh and the entities he controlled would vote for the current board members to remain as directors; that "the Board would meet with Mr. Mehdizadeh on specified dates during the term of the agreement to discuss and to hear matters of interest or concern of Mr. Mehdizadeh, as a stockholder of the Company;" that Defendant Mehdizadeh and the entities he controlled would secure a $1 million investment in Medbox; and that Defendant Mehdizadeh could appoint a fifth director to the Company's board.

120.   The agreement, which was attached to the Form 8-K stated that Defendant Mehdizadeh would no longer act as a consultant to Medbox or its subsidiaries, that he would no longer purport to act on behalf of Medbox unless so authorized by the Company's board or the agreement, and that he would not "contact or interfere with any Medbox employees, consultants, directors or shareholders."

121.   The agreement also gave Defendant Mehdizadeh and the entities he controlled the right to review Medbox's documents in order to assist with the Company's investigation of its 2012, 2013, and 2014 financial statements and to provide a summary to assist the Company's management with managing Medbox.

122.   Additionally, the agreement stated that Medbox's chairman Defendant Siegel would meet with Defendant Mehdizadeh regularly to discuss his concerns.  The agreement thus stated in pertinent part:

> Medbox shall cause one or more of its directors, initially Siegel, to meet and confer in good faith with VM not less infrequently than semi-monthly (or on a different frequency as mutually agreed by Medbox and VM) to hear and discuss any matters of interest or concern of VM, as a shareholder of Medbox. These matters shall

initially include, but are not limited to (i) adequacy of Medbox's staffing, (ii) implementation of new consulting arrangements related to executed amendments to client consulting agreements previously agreed to by Medbox but not yet tendered to clients as promised, to ensure client satisfaction and (iii) Medbox's completion of its evaluation, through Singer Lewak, of its prior period financial reporting.

123.    On February 6, 2015, Medbox filed a Form 8-K with the SEC that stated that it replaced Q Accountancy as its independent auditor with Marcum LLP.

124.    On March 4, 2015, Defendant Mehdizadeh filed with the SEC a Schedule 13D/A that reported that he agreed to sell his 62% stock interest in Medbox to Lizada Capital LLC for $15 million.

125.    On March 9, 2015, Medbox filed a Form 8-K with the SEC that provided results of its investigation of the Company's financial statements for 2012, 2013, and 2014. The Form 8-K stated in pertinent part:

As a result of certain errors described below, discovered in connection with such comprehensive review, the Audit Committee, upon management's recommendation, concluded on March 6, 2015 that, in addition to the restatements announced in the Original 8-K, the consolidated financial statements for the year ended December 31, 2012, together with all three, six and nine month financial information contained therein, and the quarterly information for the first two quarters of the 2013 fiscal year, should no longer be relied upon and will be restated to correct the errors. Therefore, all earnings press releases and similar prior communications issued by the Company as well as other prior statements made by or on behalf of the Company relating to financial reporting or results for those periods should not be relied upon.

Management and its professional advisor have completed the review of revenues recognized and related contracts for the years 2012 and 2013 and interim period for the nine months ended September 30, 2014. Conclusions thus far from the review include:

1) revenue on some contracts with customers was recognized before all required revenue recognition criteria were met, resulting in an overstatement of revenue in ranges of approximately $1,300,000 to $1,500,000, $3,000,000 to $3,200,000 and $600,000 to $900,000 for the years 2012, 2013 and the nine months ended September 30, 2014, respectively;

2) certain transactions with related parties in ranges of approximately $500,000 to $600,000 and $800,000 to $900,000, for 2012 and 2013, respectively were improperly recorded as revenue instead of additional paid in capital in stockholders' equity; and,

3) certain inventory costs were capitalized improperly resulting in an understatement of cost of sales. Costs of approximately $600,000 and in a range of approximately $1,300,000 to $1,400,000, for 2013 and the nine months ended September 30, 2014, respectively previously reported in inventory in 2013 and 2014, respectively, will be recorded as cost of sales in the statement of operations for 2013 and the nine months ended September 30, 2014, respectively. These costs incurred prior to executing a contract with a customer, seeking licenses and locations and closing on real estate to operate a dispensary or cultivation center should have been recorded as current period expense.

126.   On March 11, 2015, the Company filed with the SEC a Form 10 A-3 that amended the Form 10 the Company filed originally with the SEC on January 21, 2014.

127.   On March 11, 2015, the Company additionally filed with the SEC a Form 10-Q A-1 that amended the Form 10-Q the Company filed originally with the SEC on November 11, 2014.

128.   On March 11, 2015, the Company lastly filed with the SEC a Form 10-Q A-1 that amended the Form 10-Q the Company filed originally with the SEC on August 14, 2014.

129.   On March 11, 2015, the Company also filed with the SEC a Form 10-Q A-3 that amended the Form 10-Q the Company filed originally with the SEC on May 15, 2014.

## DAMAGES TO MEDBOX

130.   As a direct and proximate result of the Individual Defendants' conduct, Medbox has expended and will continue to expend significant sums of money.

131.   Such expenditures include, but are not limited to, legal fees associated with the class action lawsuits filed against the Company and four of the Individual Defendants

for violations of the federal securities laws, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations, the SEC investigation and the federal grand jury investigation, and any fines and/or settlement payments that the Company may have to pay after the investigations and any related potential prosecution are completed.

132.   Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

133.   Additionally, the Company's earnings restatement had triggered a default by the Company on its debt covenants, forcing the Company to seek a forbearance from lenders, and causing an increase to the Company's cost of borrowing funds.

134.   As a direct and proximate result of the Individual Defendants' conduct, Medbox has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misrepresentations made by the Individual Defendants and caused to be made by the Company by the Individual Defendants.

### DERIVATIVE ALLEGATIONS

135.   Plaintiff brings this action derivatively and for the benefit of Medbox to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Medbox and unjust enrichment, as well as the aiding and abetting thereof.

136.   Medbox is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.    Plaintiff is, and at all relevant times has been, a Medbox shareholder. Plaintiff will adequately and fairly represent the interests of Medbox in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

138.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

139.    A pre-suit demand on the Board of Medbox is futile and, therefore, excused. At the time of filing of this action, the Board consisted of the following four Individual Defendants: Siegel, Lowe, Marsala, and Love (collectively, the "Current Directors"). Plaintiff needs only to allege demand futility as to two of the four Current Directors.

140.    All of the Current Directors are beholden to Defendant Mehdizadeh and were appointed as directors by him only.

141.    Evidence that the Current Directors are beholden to Defendant Mehdizadeh, who is the most responsible for the knowingly committed fraud at Medbox, is that none of them have sued him, but instead continue to serve him.

142.    Even after Defendant Mehdizadeh's fraud was exposed to the world, and even after the Current Directors admitted that Defendant Mehdizadeh's engaged in serious misconduct, instead of suing Defendant Mehdizadeh or holding him accountable for his misconduct, the Current Directors knowingly breached their fiduciary duty by causing the Company to enter the agreement with Defendant Mehdizadeh on January 21, 2015 that requires involving him in management of the Company, the Company's internal

investigation, and the Company's restatement of its financial results, and providing him access to the Company's records.

143.   The January 21, 2015 agreement requires Defendant Mehdizadeh to not remove any of the Current Directors from Medbox's board.  That proves that the Current Directors have been and will continue to prioritize the interests of Defendant Mehdizadeh over those of Medbox in exchange for keeping their positions on the board.

144.   Thus, as all of the Directors are disinterested, not independent, and face a substantial likelihood of liability, demand on all of the Current Directors is futile and must be excused.

145.   Additionally, all of the Current Directors have failed to this day to appoint three independent directors to the Company's Audit Committee, as required by the Audit Committee Charter. The only Current Directors who are Audit Committee members are Defendants Love and Siegel.

146.   An audit committee is crucial to a publicly traded company, but especially for Medbox at which fraud has been widespread and at which false financial statements since the Company's inception have been reported in SEC filings.  The Current Directors have long been aware of Medbox's financial reporting, revenue recognition, audit, and independent auditor problems, so they were, at a minimum, severely reckless in failing to take even the most basic step in corporate governance to rectify those problems by ensuring that the Audit Committee is properly comprised of sufficient independent directors and that it functions as a publicly traded company's audit committee ordinarily functions.

Verified Shareholder Derivative Complaint

147.   Additionally, even after Defendant Mehdizadeh's fraud was exposed to the world, and even after the Current Directors admitted that Defendant Mehdizadeh's engaged in serious misconduct, the Current Directors failed to cause the enactment of changes to the Company's corporate governance.

148.   Moreover, the Current Directors knowingly participated in the fraud at Medbox by failing to disclose to investors for three months the grand jury investigation pertaining to Medbox.

149.   For these reasons, too, all of the Directors are disinterested and face a substantial likelihood of liability, and demand on all of the Current Directors is futile and must be excused.

150.   Significantly, Defendant Marsala is not only one of the Current Directors but is Medbox's Chief Executive Officer.   As Chief Executive Officer of the Company, Defendant Marsala is an employee who derives substantially all of his income from his employment with Medbox, rendering him not independent.   Defendant Marsala also signed the 2Q 2014 10-Q, which contained false financial statements.   Additionally, Defendant Marsala is a defendant in the securities fraud class actions. For these reasons, alone, in addition to the reasons set forth above, Defendant Marsala faces a substantial likelihood of liability, demand upon him is futile and, demand upon him is, therefore, excused.

151.   Also, in complete abdication of their fiduciary duties, the Current Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price, and by subsequently failing to timely correct said false and misleading statements of material fact.   The fraudulent scheme was intended to make the

Verified Shareholder Derivative Complaint

Company appear more profitable and attractive to investors, and to increase the Company stock price.  As a result, the Current Directors breached their fiduciary duties.  Thus, each of the Current Directors face a substantial likelihood of liability, and demand upon them is futile.

152.    Furthermore, demand is excused as to all of the Current Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme, which renders them unable to impartially investigate the fraud and decide whether to pursue action against themselves and the other perpetrators of the scheme.

153.    Moreover, the Current Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Current Directors from adequately monitoring the Company's operations and calling into question the Individual Defendants' conduct.  Thus, any demand on the Current Directors is futile, and thus demand is excused.

154.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Current Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Current Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment

Verified Shareholder Derivative Complaint

about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155.   The acts complained of herein constitute violations of fiduciary duties owed by Medbox's officers and directors and these acts are incapable of ratification.

156.   The Current Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Medbox.  If there is a directors' and officers' liability insurance policy covering the Current Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Current Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Current Directors were to sue themselves or certain of the officers of Medbox, there would be no directors' and officers' insurance protection.  Accordingly, the Current Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Current Directors is futile and, therefore, excused.

157.   If there is no directors' and officers' liability insurance, then the Current Directors will not cause Medbox to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

Verified Shareholder Derivative Complaint

158.    Thus, for the reasons set forth above, all of the Current Directors, and, if not all of them, certainly at least two of the Current Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Current Directors is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Medbox's business and affairs.

161.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

162.    The Individual Defendants' misconduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or negligently engaged in misconduct in breaching or disregarding their fiduciary duties to protect the rights and interests of Medbox.

163.    In breach of their fiduciary duties owed to Medbox, the Individual willfully participated in misrepresentation of the Company's business operations and prospects and failed to correct the Company's public statements, rendering them personally liable to the Company for breaching their fiduciary duties.

164.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Medbox's securities.

165.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Medbox has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

### SECOND CLAIM

**Against Individual Defendants for Unjust Enrichment**

167.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.     By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Medbox.

169.    At all relevant times, the Individual Defendants either received bonuses, stock options, or similar compensation from Medbox that was tied to the financial performance or artificially inflated valuation of Medbox or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

170.    Plaintiff, as a shareholder and a representative of Medbox, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Medbox, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Medbox;

(c)    Determining and awarding to Medbox the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Medbox and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Medbox and its shareholders from a repeat of the

Verified Shareholder Derivative Complaint

damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of Medbox to nominate at least three candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Medbox restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated:  May 20, 2015          Respectfully submitted,

                    **LEVERTY & ASSOCIATES LAW CHTD.**

                    */S/ Patrick Leverty*
                    Patrick R. Leverty
                    Reno Gould House

Verified Shareholder Derivative Complaint

832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

Liaison Counsel for Plaintiff


Laurence M. Rosen, Esq.
Phillip Kim, Esq.
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Timothy W. Brown, Esq.
THE BROWN LAW FIRM, P.C.
127A Cove Road
Oyster Bay Cove, NY 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

Counsel for Plaintiff

Verified Shareholder Derivative Complaint

<u>VERIFICATION</u>

I, Patricia des Groseilliers, am the plaintiff in the within action and am a citizen of Pennsylvania. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 20th day of May 2015.

DocuSigned by:

*Patricia des Groseilliers*

884175A9DEAA4C0...

Patricia des Groseilliers